Thank you, Your Honors. Good morning. Peter Bohan on behalf of Appellant Jacqueline Roeder and my law partner Anthony Bohan is here with me as well. Your Honors, I will attempt to summarize four main points where the District Court erred in this case. First, the District in the look-back period was caused by a degenerative disc disease cervical spine condition which was diagnosed in the post-coverage period. The reason that the Court committed error in making this determination is because of various, of how the Court went about to make its inferences. The Court pointed to the only record in the look-back period which was the urgent care record. The Court indicated that in that record, because there was a slash mark, neck pain. The Court, now Ms. Roeder presented to the urgent care in the look-back period, that's the only medical document within the look-back period. The Court essentially found that the slash mark indicated two separate medical issues. No other medical provider made any comment with respect to what the slash mark indicated. Something tantamount to causation or a link between the neck pain in the look-back period and the later diagnosed condition. Therefore, it was speculative by the judge in making that determination. The existence of an incipient condition is not alone to make the determination that there is a link or a causation between the later diagnosed condition and the look-back period symptoms. Additionally, the District Court made the comment that the pre-coverage treatment in the look-back period, the trigger point injection for this nonspecific symptom of neck pain, was the same as the post-coverage treatment, but it was not the same. In the look-back period, she had medications that were prescribed, she had acupuncture, physical therapy, and this was not a correct determination. Second, Your Honors. What do we make of the comment, and I thought I had it here, but by one of the treating physicians, I think it was in March of 2020, where they stated she apparently had, or she referenced earlier treatments with cortisone shots as having provided relief and increased neck mobility. That would indicate that she had been having some ongoing treatment for some period of time. Your Honor, what is the specific treating source on that one? I'll have to look at the specific record. I don't have it right in front of me at this point, but there was some reference to prior cortisone treatments. With respect to comments that the District Court mentioned that she had been having these treatments, it's important that none of those references that the Court cited refer to the look-back period specifically, and therefore it's speculative as to what on and off for some period of time really meant. Further on that point, the diagnosis of the degenerative disc disease cervical condition happened in May 28th. Dr. Safman, 3 ER 154, made the diagnosis of the condition at that point, and there was a comment by Dr. Rahavi on a May 21, 2020, televisit, which was already four months beyond the look-back period, where there was a comment that the condition had been worsening from March or April of 2020. At this point, there is a diagnostic procedure that has occurred. There's a CT scan that indicated severe degenerative disc disease, and so there's objective findings at this point. The condition essentially manifests at this point. So again, the more logical or reasonable inference as to the off-and-on period during which he was having symptoms is arguably more appropriately between late March, April of 2020, up to the point of diagnosis, and later to the confirmed diagnosis in September by Dr. Vyas, 3 ER 171. Your Honor, the court further erred in its interpretation of the case law that it cited as a plethora of case law from out of circuit, which the court relied on with respect to the treatment for clause. The cases that the court cited, McLeod, Mitzell, Lococo, Pitcher, Sanders, those cases indicated that knowledge or suspicion of the condition in the look-back period was required in order to trigger the pre-existing condition exclusion. And the court, however, refused to extend that rationale to the symptoms clause, the next clause in the pre-existing condition exclusion. And courts in ERISA and long-standing insurance law are under the duty to interpret provisions narrowly and consistently among provisions. And therefore, the fact that the court did not extend the rationale that knowledge or suspicion of the condition in the look-back period is needed in order to trigger the pre-existing condition exclusion, that was, the court erred in not doing so because logically that rationale should extend to the symptoms clause provision. The courts discussed, in fact, and mentioned symptoms in the context of pre-existing condition exclusions. And importantly, the McLeod case makes the comment that the term symptom is only a meaningful term in relation to something else. So the obvious question that is raised is symptoms of what? And the court did not, interestingly, the court cited the Sanders case, the Ninth Circuit District Court case from Oregon. The Sanders case in the context of analyzing the treatment for clause, but omitted discussing it in the symptoms clause. But Sanders stated that nonspecific symptoms during the examination of a patient from an undiagnosed condition are not sufficient to trigger the pre-existing condition exclusion. Third, Your policy language in the pre-existing condition exclusion is arguably ambiguous by its terms and should be strictly construed against Guardian and in favor of Roeder, pursuant to contra-prophorentum, doctrine of contra-prophorentum. The term suffered from is arguably ambiguous in the sense that the district court appears to have placed a high emphasis on existence of the condition. During trial, the court asked, well, is the condition existed? Did it not? And yes, I think that's a reasonable, we argue that's a reasonable inference. Council, as you noted, this decision was made after a bench trial. So all of this evidence was presented to the court. And the court made this determination. What's our standard of review? Your Honor, with respect to, with respect to the court's determination that whether or not there was a pre-existing condition, what's our standard of review of that determination by the district court? I think the court can apply a clear error standard with respect to the court's determination of factual findings, obviously. And the question of the determination that degenerative disc disease caused neck pain in the look back period is arguably a finding of fact, subject to clear error review. However, the reasonableness of the court's inferences is, is potentially something that the court can review on, you know, on the court's own standard. What do you mean? What does that mean? That we review it by the court's own standard? What does that mean? The court can review it, whether or not it's, can review it de novo. So what case supports the proposition that we review the inferences that were drawn by the court de novo? What case says that? Your Honor, the, again, I'm, this is potentially a mixed question of, of law and fact with respect to the, I think. What case says that the review of inferences that are drawn by a court during a trial is a mixed question of law and fact? The, well, again, Your Honor, I think that this, this case involves errors that are both factual errors and, and legal errors. So let me ask you this. As I understand your argument is that your client had no notice, nor did any of her treating physicians have any notice of a potential degenerative spine condition or neck condition prior to March, April timeframe 2020, right? Yes, Your Honor. What do the, what do her treating records show for the period prior to the look back period? Is there anything in those records to show that she had ever been treated for back or neck pain? Well, Your Honor, the, the record indicated, in this case, the, the look back period is the determinative. But, but you're saying there's no suspicion of any problem. And I want to know, is, was she ever treated previously? To me, that would be very, very relevant on whether or not the treatment during the look back period related to a preexisting condition. She was not treated specifically for degenerative disc disease, nor, nor was there any indication that any, any treating source suspected that there was degenerative disc disease. And that's, that's in her records from before the look back period. From before the look back period? Yes, Your Honor, yes. There's no indication that she was treated for degenerative disc disease or that some treating provider had a suspicion that that's what she had. Your Honors, I'm running out of time. Finally, the, I want to bring to the Court's attention the, the fact of the Collier case that found error in the Ninth Circuit case of Collier, that new rationales that were raised by the court that were not raised in the admin period constituted error. In this case, the denial letter from Guardian indicated that symptoms of neck pain for which Rota received treatment during the look back period resulted in the subsequent diagnosis of degenerative disc disease. This is 3 ER 154. The court and Guardian, for the first time in litigation, raised the issue of symptoms clause as a basis for exclusion. And, and the courts and Collier cited Glista, the case of Glista, which has very similar facts to the policy language in this case. And the communications from the insurance company to the insured, specifically, in that case, the, the court found that it was reversible error for the court to rely on the symptoms clause as a basis for exclusion when the communications from the insurance company did not specifically indicate or communicate that they were relying on the symptoms clause in order to deny the claim. Thank you, Your Honor. Thank you, counsel. You've used your time. We'll give you a minute for rebuttal. Okay, thank you. Thank you, Judge Rawlinson, and may it please the court. My name is Caleb Wallenbeck, and I'm here on behalf of Guardian and the plan. This appeal revolves around factual findings that this court reviews only for clear error. The key factual findings are that Ms. Rota's degenerative spinal condition caused neck pain during the look back period. And Ms. Rota, as a person would, received medical treatment as a result. Those findings are correct, and they certainly aren't clearly erroneous. And they trigger both the treatment clause and the symptoms clause of the preexisting condition exclusion. So what, what is the evidence in the record that demonstrates that there's a causal connection between the neck pain and then the later diagnosed degenerative cervical spine condition? Is it just primarily that slash mark in Dr. George's notes? Or what, what, what's the causal evidence? It is not just the slash mark, Your Honor. That treatment record from January of 2020 from Irvine Urgent Care is very helpful and significant. But there are at least four other aspects of the record that I would point you to. One is the history of neck pain. I believe, Judge Malloy, you were getting to this earlier when you talked about Dr. Schacher's April 2020 notes. We said that Ms. Rota had been having difficulty moving her neck without cortisone injections, but that due to the pandemic, she had been having trouble finding those injections and that a herbal remedy was not providing the same level of relief. Was there any follow-up made as to what was meant by those cortisone injections? I don't believe in, for Dr. Schacher, that was a follow-up. But then there's also Dr. Rahabi's statement from the May 2020 televisit, where he said that plaintiff had been bothered by this problem, meaning neck pain, off and on for an extended period before March of 2020. A reasonable interpretation of that is that it would include the period of January 2020, which is in the look-back period. There's also the fact that this is a chronic condition. Dr. Garrett said that the changes in Ms. Rota's spine occurred gradually over the course of several years. Dr. Rahabi agreed that this was a chronic and degenerative condition. And on page 7 of the further excerpts of record, my friend told the district court they didn't contest that this condition existed in January of 2020. The question is about when it started causing symptoms. Ms. The question is just about those two months before, whether it was also causing neck pain in that time. And the treatment, while it was, there were additional forms of treatment after the neck pain increased. There were trigger point injections before and after the diagnosis. And the trigger point injection on January 2020 was not connected to the sinus pain or to the sinus infection graph. How do we know that? Well, so reading the treatment record from Dr. George, she complained of sinus infections, comma, wants IV. And then there is that slash neck pain. That reasonable interpretation of that is that those are two different complaints. And then the bottom half of the page shows that she received IV antibiotics for the sinus infection. And then a trigger point injection and electrical stimulation to the cervical spine for the neck. That doesn't say, it doesn't say IV sinus, does it, and trigger? I mean, I'm looking at it. It doesn't say that. No, and I didn't mean to suggest that it wrote, you know, for sinus infection. But the IV antibiotics, that was, that would have been what you would treat the sinus infection with. You wouldn't. And then the trigger point injection, that's a form of treatment for neck pain. And it says either C5 or CS, I mean, either C5 vertebrae or just the cervical spine generally, which is the area that Ms. Roeder has the degenerative spinal condition. And the trigger point injection would involve sticking a needle into the back of Ms. Roeder's neck and injecting it with either, there are several different things you can inject, and the record doesn't show. But oftentimes it's platucaine or cortisone steroid in order to relieve that pain. That's a lot more involved than just recommending an aspirin or relying on the IV antibiotics to resolve the neck pain over time and a reasonable interpretation of all of these factors together. And on clear error review, the court takes the record as a whole and asks whether this is a plausible interpretation. The court has to have a firm and definite conviction that the district court erred in order to say that it was clear error. And if there are multiple ways to interpret the record and they're both permissible, then it's not clear error to choose among those options. And looking at the record as a whole, the district court did not clearly err in saying that the degenerative spinal condition, which again Ms. Roeder says caused pain in the March and April period, is a reasonable interpretation that it also caused neck pain during the lookback period. Is there any question in the record that a trigger point injection means inserting a needle into the cervical spine and then injecting lidocaine or cortisone or some type of anesthesia? I don't know if in the record there's that particular definition, but that is what a general, what that term means. That is, you can inject, you can do a trigger point injection for multiple parts of the body, but that is what a trigger point injection is. It involves, it could be dry needling, but it is an injection. What do you mean by dry needling? Sometimes doctors, it's almost like a form of acupuncture. You stick the needle in, there's nothing injected in, but you still provide that level of relief. And all of this, it's a reasonable interpretation of the record as a whole to say that there was neck pain in the lookback period and that it was caused by the degenerative spinal condition that had been developing over the course of several years. It's a chronic degenerative condition. And that triggered the symptoms clause, which is a prudent person test. It looks at symptoms as to whether a prudent person would have sought treatment for the symptoms and whether the symptoms were caused by the condition that would later become disabling. It doesn't require any actual diagnosis or treatment. It doesn't even, it doesn't require a diagnostic process. It can apply when doctors miss a diagnosis. It can apply when the insurer doesn't seek medical attention at all. Now, my friend wants to read in a knowledge or intent requirement into that and looks at cases about treatment clauses, what it means to treat someone for something. But the language in the symptoms clause here is different. And that difference matters. The question is whether there was a causation of symptoms for which a prudent person would usually seek treatment. Again, no requirement of a diagnosis and there's no requirement of actual medical treatment. And that reflects how medicine works, is that doctors often treat symptoms without a diagnosis, without even looking for a diagnosis. And it encompasses the situation where someone doesn't go to the doctor at all and is either willfully blind to their own symptoms or simply holds off on treatment until they get disability coverage. And the district court was right not to read in a knowledge or intent requirement. There is no textual basis in the symptoms clause for requiring some level of awareness of a diagnosis. It would be hard to know what level of awareness would be enough, particularly because the second paragraph of that first bullet says that it applies whether there's a diagnosis, meaning whether or not there's a diagnosis, which is consistent with the way that the first paragraph of the first bullet works, which is looking at diagnosis in particular. The second paragraph looks at the condition. It doesn't look at the diagnosis, including times where there are no diagnosis. And you agree that there's nothing in her medical records prior to the look-back period to show that she had received any treatment for neck or back pain or that there was any type of suspicion or diagnosis of a cervical problem? Your Honor, I don't know if we acquired the medical records before the look-back period. Because they're not relevant to the inquiry, we are limited to looking at that three-month period from November to January. Wouldn't they be relevant if, in fact, she had actually been diagnosed with the condition? So we don't contest here that she wasn't diagnosed with the degenerative spinal condition? No, I mean, but what if she had been diagnosed and had been treated for this condition for a year prior to the look-back period? Wouldn't that add some credibility to the argument that the trigger point injection was for a previously diagnosed condition? Yes, Your Honor. But here we see the diagnosis in the subsequent period. And so we didn't go looking for a diagnosis because it appeared from the record that there wasn't one defined in that look-back period, or before the look-back period, rather. Now, as far as the term suffered from, that also doesn't incorporate an intent or knowledge requirement. To suffer from a condition simply means to have it, and that it's an adverse condition. There's nothing... You can suffer from a condition without knowing what it is. And the rest of the paragraph does work in showing that it's not a latent condition. There needs to be either treatment or symptoms from that condition. Now, this is... Now, as far as the argument that we've made a new rationale on appeal or in litigation, that's not correct, but it also is waived in the district court, in the opening and responsive trial briefs. Ms. Roderick did not argue that we had asserted a new rationale in litigation, even in the opposing trial brief. The argument about shifting rationales was that between the first and second appeal denials that the language had changed, but the argument was not that we had asserted a new rationale for the first time in litigation. And the district court looked at this symptom clause as a whole, as Guardian did, in its letters. We quoted the entire pre-existing condition exclusion. We've consistently maintained that Ms. Roder had the degenerative spinal condition, that it caused symptoms, and that those symptoms led to treatment. And it was... The letters are not... They don't need to be a legal brief and explain all of the legal arguments about why one clause is interpreted one way or another. We relied on the clause as a whole, the exclusion as a whole, but the symptoms clause and the treatment clause. While I've got about three minutes left, let's say a few words about the treatment clause. This court doesn't need to reach it if it affirms on the symptoms clause, but it is an independent alternative grounds for affirming, because the language in this treatment clause is different than the language in cases like McLeod and Sanders. Here, the policy expressly says that the treatment clause applies whether there's a diagnosis, including situations where there is no diagnosis. It keeps the focus on the health of the insured, not on the skill or intent of the physician, and includes situations where there is no diagnosis. And this accords with how the plain language of the clause works, and that people can receive treatment for a condition without having a diagnosis of that condition. The word for is just a preposition that gives some structure to the sentence. It shows that there's either a relation or suiting the needs of, that the treatment is suiting the needs of or relevant to the condition. It doesn't read in a requirement that there be a formal diagnosis or awareness of a formal diagnosis or a certain level of suspicion of a formal diagnosis. It's enough that the physician provide treatment for that condition. And in looking at all of this, the court first gives the words their plain and ordinary meaning. It doesn't strain to find ambiguity. It looks at the policy as a whole and only deploys contra profferentum if, after using all of the tools of contract interpretation, that there are two conflicting but reasonable meanings. Here, the plain language of the clause shows that there is no intent or suspicion requirement. I see that my time is almost expired. If there's any potential other questions, I would like to say just a moment, say a few words about the argument for a remand. If this court were to disagree with everything I've said, the correct approach would be to condition to see whether she is, in fact, disabled. We've consistently maintained that that would be the next step if the pre-existing condition exclusion were not to apply. And in fact, that's what happened in Collier, where this court reversed, sent it back down to the district court. And then a few months ago, the district court sent it back down to the plan administrator for further proceedings. Thank you for your time.  Thank you, counsel. Let's have one minute for rebuttal. Thank you, Your Honors. I need a second trip back to the desk. Pardon my mess. Your Honors, with respect to Judge Rawlinson's question regarding standard of review, in reply brief, we talk about at page 25 of the reply brief, I'm sorry, page 34 of the reply brief, that legal conclusions are reviewed de novo. Rule 52 does not apply to conclusions of law, citing Burke versus retirement plan for pilots. Counsel, my consideration is that this was a trial. The judge had the opportunity to review all of this evidence, hear the arguments of counsel, and then make a decision based on the medical records and all of the inferences that can be drawn from those. And we review that for clear error. And I have some difficulty saying that based on the evidence that's in the record, the district court clearly erred in its determination. Yes, Your Honor. We do understand that. However, we would argue to the court that some of these findings by the district court do involve mixed fact law questions. And those, if the court considers to be predominantly legal questions, could be reviewed under a de novo standard. Do you think that the determination whether or not there was a pre-existing condition is a legal question or a factual question? Because the court would be, the district court would be interpreting the pre-existing condition clause. That would be a legal, I would argue that would be a legal determination. The court is analyzing a legal question there. What's the legal question? Should the trigger, should the pre-existing condition clause be triggered to exclude, to deny benefits? But before making that legal conclusion, the court would first have to make a factual determination whether or not there was a pre-existing condition, correct? Well, with respect to, I would say yes and no. With respect to, again, certain issues such as causation, causation would be a factual determination. However, in making inferences and whether or not the inferences were reasonable, inferences is potentially a question that is a legal question. You said that before, and I asked you for a case that supports the proposition that inferences drawn by a court when evaluating evidence is a legal issue. And you didn't give me a case that says that. Well, again, we're seeing that inferences, a court can make reasonable inferences, but not unreasonable inferences. And so this court can make the determination. Then that would be clear error. If the inferences that the court drew from the evidence presented were not reasonable, then that would be clear error. Your Honor, if I may address or push back on one or two points, if I please. Your Honor, counsel mentioned that the Collier case, again, is a case where that was decided in 2022, I believe a week, that was handed down a week before this court determined that the district court issued an opinion. And the court did cite Collier. However, the court did not cite Collier with respect to whether or not a new rationale was being determined or brought forth by the district court. It did not discuss that. And we think that Collier is an important case that would potentially find that the court committed error because the court considered new rationales that Guardian clearly did not consider. All right, counsel. Thank you. You've exceeded your time. Thank you to both counsel for your helpful arguments. The case as argued is submitted for decision by the court. The final case on calendar for argument today is State of Montana.
judges: RAWLINSON, Melloy, THOMAS